UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH FRIAS,<br><br>                              Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>                              Defendants. | Case No.:  3:22-CV-00675-JO-AHG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Joseph Frias brought this civil rights action pursuant to 42 U.S.C. § 1983. Dkt. 42 ("Third Am. Compl.").  He alleges that, while he was housed at the George Bailey Detention Center, various San Diego County Sheriff Deputies used excessive force to restrain him while he was suffering from seizures.  *See id.*  The five deputies and two supervisory officers named in the complaint along with San Diego County (collectively "Defendants") filed a motion for summary judgment on all of Plaintiff's claims.  *See* Dkt. 92-1 ("Mot. Summ. J.").  For the reasons stated below, the Court grants in part and denies in part Defendants' motion.

/ / /

1

# I. BACKGROUND

## A. Deputies Le, Jacobo, and Bohan Moved Plaintiff to the Medical Area After He Fought Other Inmates

On March 9, 2021, Plaintiff Joseph Frias, a pretrial detainee at the George Bailey Detention Facility, fought numerous other inmates while intoxicated and then was pepper-sprayed as a result. Dkt. 99-1 ("SUF") ¶¶ 1–6. On that day, Plaintiff consumed "two to three" cups of *pruno* (jail-made alcohol) and engaged in three fights with other inmates at the county jail. *Id.* To break up the third fight, the deputies on duty pepper-sprayed Plaintiff's face. *Id.* ¶ 8. Subsequently, to decontaminate Plaintiff of the pepper spray, Deputies Steven Le, Johan Jacobo, and Bret Bohan escorted him from the jail's housing area to its medical area. *Id.* ¶¶ 42, 59, 68–69.

While on the way to the medical area, Plaintiff informed Deputies Le, Jacobo, and Bohan multiple times that he was going to have a seizure. *Id.* ¶ 9; Dkt. 99-3 ("Frias Dep.") at 16:3–19. Specifically, Plaintiff remembers telling them, "[l]ook, I'm going to have a seizure. I am having an aura. I'm going to have a seizure. I can't breathe." *Id.* at 16:14–16. Shortly thereafter, Plaintiff blacked out on account of what he believes was a seizure. SUF ¶ 9. In addition to this warning, Plaintiff had previously reported to county jail medical staff that he is epileptic and that he has experienced seizures while in custody. *See* Dkts. 99-13 ("Pl.'s Ex. 12"), 99-14 ("Pl.'s Ex. 13").[1] Because he blacked out, Plaintiff has no further recollection of the events until he later woke up at the hospital.[2] SUF ¶ 9.

## B. Deputy Le Held Plaintiff Down While in the Medical Holding Cell

After Plaintiff arrived at the medical area, multiple deputies observed Plaintiff's

---

[1] The County objects to Plaintiff's medical chart on relevancy grounds. Dkt. 107-1 ("Defs.' Evid. Obj.") at 4. The Court OVERRULES this objection because the medical chart, which states that Plaintiff suffers from a seizure disorder, does make a fact of consequence—whether Plaintiff was suffering a seizure on March 9, 2021—more probable. *See* Fed. R. Evid. 401.

[2] The remaining facts in the record are from the accounts of medical staff and officers on the scene. *See* SUF ¶ 9.

2

22-cv-00675-JO-AHG

body tense up and shake back and forth. Upon Plaintiff's arrival, medical staff washed the pepper spray from Plaintiff's face. SUF ¶ 10. During this initial treatment, Plaintiff frequently spit blood and saliva and appeared disoriented and confused. *Id.*; Dkts. 99-6 ("Le Report") at 2, 99-7 ("Bohan Report") at 3. After decontaminating Plaintiff, medical personnel placed him in an adjacent medical holding cell for further evaluation. SUF ¶ 11. After Plaintiff was in the holding cell for a short period of time, Deputy Le noticed Plaintiff lying stiffly with his arms "rigid[ly]" stuck out, appearing as if he were "uncomfortable" and in "medical duress." *Id.* ¶ 12; Dkt. 92-2 ("Defs.' Exs.") at 75:19–76:3, 77:4–24; Le Report at 2. Concerned, Deputy Le tried to get Plaintiff's attention but Plaintiff was "unresponsive." Defs.' Exs. at 83:12–84:6. Subsequently, Deputy Le observed Plaintiff's body occasionally "shake almost as if he were seizing." Le Report at 3. In light of Plaintiff's condition, Deputy Le believed that Plaintiff was unconscious and experiencing a seizure. Dkt. 99-5 ("Le Dep.") at 39:14–40:7, 50:11–51:11. From outside the holding tank, Deputy Bohan observed Plaintiff in a state of "medical distress" and Deputy Jacobo even saw Plaintiff "thrash" "his entire body from side to side." Bohan Report at 3; Dkt. 99-8 ("Jacobo Report") at 2.

Despite Deputy Le's impression that Plaintiff might be experiencing a seizure, he decided to restrain Plaintiff by holding him down. Upon seeing Plaintiff in this state, Deputy Le yelled for medical staff to come. SUF ¶ 12; Defs.' Exs. at 81:10–82:11. Le then checked Plaintiff's airways to ensure that he was breathing and not choking on account of having a seizure. Defs.' Exs. at 82:16–83:11. Next, Deputy Le turned Plaintiff on his side to put him in the "recovery position," which is a side-lying position that aids an individual's breathing. *Id.* at 127:9–128:4; Le Report at 3; SUF ¶ 44. Despite Plaintiff's body being rigid and shaking as if "seizing," Deputy Le used both of his hands to apply downward pressure on Plaintiff's hip and ribs to keep him in this position. Le Report at 3; Bohan Report at 3. The current record evidence indicates that Deputy Le took these actions of his own accord; there is nothing indicating that medical staff directed Deputy Le to apply pressure and hold Plaintiff in this manner.

While Deputy Le was in the medical holding cell with Plaintiff, both Deputy Andrew Tapia and Lieutenant Roberto Martinez arrived at the scene. Upon arriving at the medical holding cell, Deputy Tapia found Deputy Le "tendi[ng] to" Plaintiff. SUF ¶ 79. In the same timeframe, Lieutenant Martinez, a supervisor of the deputies, also came and stood five feet outside the medical holding cell to provide support after he was notified about an incident requiring medical attention. Dkt. 99-26 ("Martinez Dep.") at 5:13–6:14; Defs.' Exs. at 405:17–406:4. While standing in the hallway, a deputy updated Lieutenant Martinez of Plaintiff's earlier fighting and his subsequent pepper-spraying and decontamination at the medical area. SUF ¶ 93; Martinez Dep. at 6:3–9. Lieutenant Martinez also heard Plaintiff yelling, prompting the deputy to inform Lieutenant Martinez that Plaintiff was likely intoxicated from drinking *pruno*. Martinez Dep. at 6:9–12. Lieutenant Martinez, however, did not have a "direct visual" of Plaintiff at the time and thus, did not observe that Plaintiff was unresponsive. Defs.' Exs. at 416:16–24, 422:8–9. He also was not advised that Plaintiff had exhibited seizure-like activity, such as "shaking, stiffening his body in and out, [or] small body tremors" or that Plaintiff was in "medical distress" beyond his intoxication. *Id.* at 420:23–421:7; Martinez Dep. at 8:16–24.

## C. Deputies Le and Tapia Held Plaintiff Down in a Wheelchair for Medical Examination

Subsequently, Deputies Tapia, Jacobo, Bohan and Le (collectively, "the Deputies") transported Plaintiff in a wheelchair to the medical examination room for medical care. SUF ¶ 13. They did so at the request of medical staff who determined that Plaintiff needed to be moved to the medical examination room across the hallway for treatment. SUF ¶ 12. At this time, Plaintiff was exhibiting symptoms like "slurred speech," "disorient[ation]," "spitting," and an inability to "stand on his own," or "keep his balance." Jacobo Report at 2; Dkt. 99-17 ("Tapia Report") at 2. Deputies Tapia, Jacobo, and Le helped move Plaintiff into the chair as he "thrash[ed]" around. Tapia Report at 2; Jacobo Report at 2. When the Deputies were transporting Plaintiff in the wheelchair, they encountered Lieutenant Martinez in the hallway. Martinez Dep. at 11:5–14. Lieutenant Martinez observed that

Plaintiff had vomit on his chin and shirt and smelled of alcohol at the time.  *Id.*

Shortly after being transported to the medical examination room, Plaintiff continued to exhibit behaviors like thrashing while his back arched and his body lifted out of the wheelchair.  When Plaintiff arrived, some medical staff were already present in the examination room, but it is unclear who. Defs.' Exs. at 88:7–15.  When Nurse Ruby Udan arrived, she saw Plaintiff being attended to by multiple nurses and Dr. John Gill.[3]  Dkt. 92-9 ("Udan Decl.") ¶ 4.  Initially, Nurse Udan noted that Plaintiff was "sitting upright in [the] wheelchair," "awake," "restless," and had "slurred speech."  Defs.' Exs. at 318.  He also was throwing up on himself and spitting fluid.  Bohan Report at 3.  However, shortly thereafter, Plaintiff was again in a state of "medical duress." Le Report at 3.  He exhibited "jerking movement[s]," and "his torso would arch backwards, and his body would lift out of the chair," and "his legs [became] stiff and pushed outward" as if he was "trying to stand up out of [the] chair while leaning back."  Udan Decl. ¶ 5; Le Report at 3; Defs.' Exs. at 90:12–18.  In light of Plaintiff's behavior, Deputy Le thought Plaintiff was possibly experiencing "seizure activity." Defs.' Exs. at 100:16–23.

In response, Deputies Le and Tapia used force to restrain Plaintiff's movements to keep him from falling out of the wheelchair and to allow medical staff to examine him. Because of Plaintiff's erratic movements, Deputy Le pushed down on Plaintiff's shoulder and upper back.  Le Report at 3.  Similarly, Deputy Tapia pressed down on Plaintiff's shoulder.  Tapia Report at 3.  Deputy Le claims that he decided, without advisement from medical staff, to apply just enough force to prevent Plaintiff from "tipping backwards or

---

[3] Plaintiff objects to the following of Defendants' Exhibits: Udan Decl. ¶ 14; Dkt. 92-9 ("Irwin Decl.") ¶¶ 6, 7, 11, 12, 13; and Dkt. 92-8 ("Magno Decl.") ¶¶ 4, 5.  Dkt. 99-2 ("Pl.'s Evid. Obj.") at 2–7. Plaintiff asserts that these statements—all of which discuss the medical need to keep Plaintiff in the recovery position—lack foundation and are inconsistent with prior statements.  *Id.*  The Court OVERRULES these objections because (1) all three declarants were present on March 9, 2021, and thus, have an adequate foundation from which to testify, *see* Fed. R. Evid. 602; and (2) these identified statements are not inconsistent, but rather mirror the declarants' medical notes, *compare* Defs.' Exs. at 312–21 *with* Udan Decl., Irwin Decl., and Magno Decl.

falling out of the chair." Defs.' Exs. at 130:16–131:7. Additionally, as Deputy Le thought that Plaintiff was suffering from a "medical emergency," he thought this force was necessary to ensure that medical personnel could evaluate and treat Plaintiff. *Id.* at 103:6–9. Likewise, Deputy Tapia reported that he applied this force to prevent Plaintiff from leaving the chair and "possibly harming himself or others." Tapia Report at 3. Around this time, Nurse Kevin Irwin arrived to find Plaintiff "attempt[ing] to stand up out of the wheelchair" and deputies "us[ing] their hands to keep [Plaintiff] sitting down in the wheelchair." Dkt. 92-9 ("Irwin Decl.") ¶ 4. While Nurse Irwin later attested that the Deputies were "needed" to make Plaintiff "sit in the wheelchair for safety reasons" and so that he "could medically assess [Plaintiff]," there is no evidence he instructed the any of the four deputies to do so—rather, they began applying pressure before Nurse Irwin arrived. *Id.* After Deputies Le and Tapia applied this force, they effectively restrained Plaintiff in the chair, preventing him from standing up. Tapia Report at 3. While Plaintiff was in the wheelchair, Nurse Irwin took Plaintiff's vital signs and attempted to monitor Plaintiff's oxygen levels.[4] Irwin Decl. ¶ 5; Defs.' Exs. at 313.

During this time, Lieutenant Martinez was also able to observe some of Plaintiff's actions while he was standing outside in the hallway adjacent to the medical examination room. Martinez Dep. at 11:12–14. From his vantage point, Lieutenant Martinez witnessed Plaintiff repeatedly try to stand up in an unbalanced and uncoordinated manner despite the Deputies' instructions to stay calm and seated. *Id.* at 6:15–19.; Defs.' Exs. at 418:8–419:12. Lieutenant Martinez also noted that Plaintiff was unstable, slurring his speech, and yelling at the Deputies. Martinez Dep. at 6:20–22; Defs.' Exs. at 418:8–419:12. Yet, Lieutenant Martinez also testified that he did not remember seeing Deputy Le or Plaintiff's back arching or his legs straightening. Defs.' Exs. at 419:16–420:17. Based on his training

---

[4] Specifically, Nurse Irwin remembers that he "would attempt to put the 02 oxygen saturation monitor on [Plaintiff's] finger, and [Plaintiff] would remove it from his finger using another finger." Irwin Decl. ¶ 5.

and experience, Lieutenant Martinez claimed that he "knew that [Plaintiff] was under the influence of *pruno*" and expected that he may need to be sent to another facility that had sobering cells, which George Bailey Detention Facility lacked. *Id.* at 408:15–19, 410:8–19. However, Lieutenant Martinez also prepared to address Plaintiff's issue as a medical problem, recognizing that Plaintiff may need to be sent to the hospital instead. *Id.* at 410:8–23.

**D. The Deputies Held Plaintiff in the Recovery Position for Medical Treatment and Monitoring**

While seated in the wheelchair in the medical examination room, Plaintiff began exhibiting trouble breathing, prompting medical staff to request that the Deputies place him in recovery position. As Deputies Le and Tapia held Plaintiff down in the wheelchair, he became restless and verbally aggressive, and repeatedly tried to stand up, to resist their attempts to keep him in the wheelchair, and to refuse medical service. Irwin Decl. ¶¶ 4–7; Bohan Report at 3. But, shortly thereafter, Plaintiff slumped over and began snoring. Udan Decl. ¶ 5. Nurse Udan soon recognized that Plaintiff was unresponsive and that his breathing was slow. *Id.* To aid Plaintiff's breathing and facilitate medical care, medical staff requested that the Deputies move Plaintiff from the wheelchair and place him in the recovery position on the ground. SUF ¶ 18. Deputies Le, Jacobo, and Tapia immediately did so. *Id.* ¶¶ 50, 62, 82.

Once in the recovery position, Plaintiff proceeded to squirm, requiring Deputies Le, Jacobo, and Tapia to apply pressure to keep him still for medical care. On the floor, Plaintiff seemed "visibly confused and appeared to be in medical distress." Bohan Report at 3. As Plaintiff "thrashed his body," "kicked his legs," and was "constantly moving," Deputy Le applied downward pressure using his right knee and hands on Plaintiff's hip and ribs to keep Plaintiff in the recovery position. Bohan Report at 3; Le Report at 3; Dkt. 92-8 ("Magno Decl.") ¶ 4. Likewise, to limit Plaintiff's movement, Deputy Jacobo applied downward pressure on Plaintiff's left shoulder using his right hand as Deputy Tapia applied pressure on Plaintiff's legs with his hands. Jacobo Report at 2; Tapia Report at 3. At some

point, Dr. Gill called 911 requesting an ambulance to bring Plaintiff to emergency care. Defs.' Exs. at 320.

Due to their efforts, Deputies Le, Jacobo, and Tapia were able to maintain Plaintiff in the recovery position so that medical staff could begin treating his condition. Le Report at 3; Jacobo Report at 2; Tapia Report at 3. To resuscitate Plaintiff, Nurse Udan performed rescue breathing by using a manual resuscitator and employed a tool to remove brownish secretions from his airways. Udan Decl. ¶ 6. Dr. Gill also inserted a nasal trumpet into Plaintiff's nose. *Id.* In response, Plaintiff seemed to wake up and gag, ultimately vomiting three times. *Id.* ¶ 7. Nurse Irwin, Nurse Udan, and Nurse Claudette Magno—who later arrived—all affirmed that holding Plaintiff in the recovery position was critical as it permitted medical staff to provide care, assess Plaintiff's airways, and ensure that Plaintiff did not choke on his own throw up. *Id.* ¶¶ 6, 13; Irwin Decl. ¶¶ 7–8, 11; Magno Decl. ¶ 5.

After vomiting, Plaintiff appeared more alert and began moving even more, interfering with the medical staff's ability to keep him in the recovery position. Plaintiff appeared upset and disoriented, and began resisting Deputies Le's, Tapia's, and Jacobo's pressure by tensing his body and thrashing and kicking more intensely. Bohan Report at 3; Le Report at 3; Defs.' Exs. at 107:6–108:5, 112:21–113:2, 222:5–15. Plaintiff also repeatedly swung his arms around and jerked his torso back and forth as he moved; spat and yelled for the deputies to let him go; and tried to "throw himself up." Defs.' Exs. at 107:6–108:5, 222:5–15. During this period, Plaintiff still needed to be held in the recovery position so medical staff, including Dr. Gill, could keep assessing his airways, and keep his vitals stable. Udan Decl. ¶ 9; Irwin Decl. ¶ 10. In treating Plaintiff, many of the medical staff believed Plaintiff was suffering from alcohol intoxication and not experiencing a seizure. Udan Decl. ¶ 14; Irwin Decl. ¶ 11.

Given Plaintiff's uptick in movement, the Deputies responded in kind. Deputy Tapia made sure only to "meet his resistance with even resistance to prevent any movement," never applying his full body weight. Defs.' Exs. at 263:10–13. In addition, Deputy Bohan, who had not previously been holding Plaintiff, joined in by applying downward pressure

22-cv-00675-JO-AHG

on Plaintiff's arms to prevent further movement.  Bohan Report at 3.  Deputy Bohan asserted that he only applied force in response to Plaintiff's resistance and that whenever Plaintiff stopped, he lightened his pressure.  Defs.' Exs. at 230:6–12.  Deputy Le also maintained his downward pressure on Plaintiff's hip and ribs, reasoning that this was necessary to prevent staff, who were still trying to medically treat and observe Plaintiff, from being hurt.  Le Report at 3.  Similarly, Deputy Jacobo maintained minimal downward pressure on Plaintiff's left shoulder but would release his force whenever Plaintiff stopped thrashing.  Defs.' Exs. at 168:13–22.  Nurse Irwin attested that if the Deputies had not kept Plaintiff in this position, he would not have "been able to safely assess him and maintain his airway" while waiting for paramedics to arrive.  Irwin Decl. ¶ 13.  After waking up, Plaintiff yelled out "you guys fucking hurt me"—a remark Nurse Magno found surprising given that the Deputies "were only holding him in place."  Magno Decl. ¶ 4.

**E. The Deputies Placed Plaintiff in a WRAP Device While Waiting for Paramedics**

When another deputy, Deputy Bret Banaga, arrived at the medical examination room, Deputies Jacobo, Le, Tapia, and Bohan were holding Plaintiff on the floor in recovery position.  Dkt. 99-10 ("Banaga Report") at 2.  To Deputy Banaga, who had been summoned to help prepare Plaintiff for transport to the hospital, Plaintiff appeared to be "resist[ing] medical attention by rolling from shoulder to shoulder on his back," "tensing his body," and "pulling his legs in" towards his chest in order to "stand up."  *Id.*  Deputy Banaga, therefore, joined the other deputies in holding Plaintiff in the recovery position. *Id.*  Specifically, Deputy Banaga placed his shins on top of Plaintiff's calves for about 45 seconds to maintain control of Plaintiff's legs.  *Id.*

Because they believed that Plaintiff was attempting to stand up, the five deputies decided to place Plaintiff in a WRAP restraint device to control his leg movements.  A WRAP device is "a maximum-restraint device" that consists of "three parts," including "a chest piece, a leg piece that wraps around the legs, and . . . a yellow ankle strap which is tied around the ankles."  Defs.' Exs. at 180:2–5.  Deputy Banaga reported that they collectively applied the WRAP's ankle strap only—not the entire device—to Plaintiff's

ankles.[5]  Banaga Report at 3.  While Deputy Banaga technically put the strap on Plaintiff, Deputies Tapia, Le, Jacobo, and Bohan aided in this endeavor: Deputy Tapia held Plaintiff's legs down while the other three deputies held Plaintiff in the recovery position so that Deputy Banaga could do so.  Defs.' Exs. at 234:12–235:19, 272:12–19.  By placing the ankle strap on Plaintiff, they effectively locked Plaintiff's feet together, enabling them to maintain control of his legs.  Banaga Report at 3; Defs.' Exs. at 182:9–13.  Deputy Banaga explained that he applied the strap to stop Plaintiff from kicking so that they could safely and rapidly transfer Plaintiff to the gurney once the paramedics arrived.  Banaga Report at 3; Defs.' Exs. at 282:4–11.  While Deputy Banaga believed that failing to apply the ankle strap would delay Plaintiff's trip to the hospital and thus, his access to medical care, there is no evidence in the record that medical staff communicated any urgency to him or the other four deputies.  Defs.' Exs. at 281:8–282:11.  By the time they applied the ankle strap, Plaintiff had already been taken out of regular handcuffs and put in waist chains—a device that include chains around the torso and attached handcuffs at each side— which are customary for transporting inmates.  *Id.* at 268:20–22, 315–16.  After securing Plaintiff, the five deputies waited for the paramedics to arrive and take Plaintiff to the hospital.  SUF ¶ 24.  Deputy Le estimated that they collectively held Plaintiff in the recovery position for a total of ten to fifteen minutes until the paramedics arrived.  Le Report at 3.  Nurses Irwin and Magno and Dr. Gill also remained with Plaintiff until the paramedics arrived and transported him to the hospital.  Irwin Decl. ¶ 10; Defs.' Exs. at 315–16, 320–21.  Plaintiff's vital signs remained stable throughout this time.  Irwin Decl.

---

[5] The parties argue over whether there is a material dispute of fact as to whether the Deputies applied the entire WRAP device or just the ankle strap. Dkt. 99 at 23–26; Dkt. 107 at 8–10. Plaintiff asserts that there is evidence showing that the five deputies used the entire device because materials in the record refer more generally to the entire WRAP. *See* Frias Dep. at 17:16–19:4; Defs.' Exs. at 313. However, the Court need not determine whether Plaintiff has raised a genuine dispute regarding whether the entire WRAP device was used because, as discussed below, the Court finds that Plaintiff has raised a triable issue on excessive force even when assuming that just the ankle portion of WRAP was employed. *See infra* Section III.B.4.

¶ 10.

While all of this was ongoing, Lieutenant Martinez was nearby on the south side of the hallway assessing the situation. Martinez Dep. at 11:12–14. As Plaintiff was being treated, Lieutenant Martinez was around twenty feet from the medical examination room. Defs.' Exs. at 405:22–406:1. Lieutenant Martinez believes that he may have originally requested that the WRAP device be brought to the medical examination room to prepare Plaintiff for transportation so as to avoid any delay in getting Plaintiff the "appropriate treatment or housing." *Id.* at 412:22–413:8. Later, Lieutenant Martinez saw Plaintiff on the gurney while in the hallway and noticed that Plaintiff was still being erratic, yelling, trying to sit up, and not following instructions. Defs.' Exs. at 408:20–409:5.

Lieutenant Martinez's subordinate—another supervisory officer, Sergeant Edmundo Garica—was also in the hallway for some unspecified portion of the above events. SUF ¶ 94. While Sergeant Garcia had little recollection of what occurred, Lieutenant Martinez testified that Sergeant Garcia moved back and forth down the hallway, and occasionally stood next to him to discuss updates. Defs.' Exs. at 413:19–414:4. Both Lieutenant Martinez and Sergeant Garcia attested that they were at the scene to evaluate the situation and provide resources as necessary. *Id.* at 407:22–24, 436:15–437:9. Deputy Bohan's report generally stated that both Sergeant Garcia and Lieutenant Martinez were present for the above events, but failed to provide specific information on where and when. Bohan Report at 3.

**F. Plaintiff's Subsequent Medical History**

Plaintiff contends that as a result of the five deputies' uses of force, he suffered serious injuries. Once Plaintiff was at the hospital, Plaintiff complained of lower extremity pain and numbness. SUF ¶ 33. Weeks later, Plaintiff underwent spinal surgery. SUF ¶ 34. Plaintiff alleges that he still struggles with persistent weakness and sensation loss in his left leg and that he is in effect partially paralyzed, rendering him wheelchair bound and incontinent. Dkt. 99-16 ("Dr. Kapuria Report") at 7; Frias Dep. at 6:6–10.

Plaintiff's expert, Dr. Abhi Kapuria, opined that during the events on March 9, 2021,

Plaintiff likely suffered multiple "tonic-clonic seizures," which were improperly handled by the Deputies. Dr. Kapuria Report at 7. According to Dr. Kapuria, symptoms of a "tonic-clonic seizure" include a first phase of "sudden loss of consciousness, stiffening of muscles, and falling," and a second phase of "rhythmic jerking movements." *Id.* at 3. Additionally, "[l]oss of awareness and recall of the event" is common and other symptoms may include "altered mental status," and "involuntary vocalizations." *Id.* To properly care for an individual, Dr. Kapuria opined that the individual's movements must not be restrained as this poses "significant risk of injury," including "fractures, dislocations, and soft tissue injuries," "head, neck, and spine" injuries, and "respiratory compromise." *Id.* After reviewing the evidence regarding what occurred and Plaintiff's medical records, Dr. Kapuria opined that Plaintiff experienced multiple tonic-clonic seizures on March 9, 2021, and that the Deputies' actions likely caused "physical injuries above what is expected from seizure activity alone." *Id.* at 7. He hypothesized that this resistance in turn may have caused Plaintiff's persistent weakness and sensation loss in his left lower extremity. *Id.*

## G. Relevant County Training and Policies

All the individual Defendants—the Deputies, Lieutenant Martinez, and Sergeant Garcia—in this case were trained on seizure response at the Peace Officer Standards and Training Academy and while employed with the San Diego Sheriff's Department. *See* Le Dep. at 3:7–18:18; Dkt. 99-4 ("Bohan Dep.") at 3:13–8:16; Dkt. 99-9 ("Jacobo Dep.") at 3:7–8:9; Dkt. 99-15 ("Tapia Dep.") at 3:4–9:23; Dkt. 99-19 ("Defs.' Resp. to Req. Produc. Docs."). Specifically, Defendants conceded that they were trained in "First Aid/CPR/AED," which included a chapter on seizures. Defs.' Resp. to Req. Produc. Docs; Dkt. 99-20 ("Seizure Training") at 3. The training materials identified common signs of seizures, such as "jerking uncontrollably," "disorientation," "slurred speech," "partial or complete loss of consciousness," "purposeless sounds and body movements," and "lack of response." Seizure Training at 3. Further, the training instructed officers to not take the symptoms of a seizure, such as "convulsions, confusion, and episodes of agitated behavior," as "deliberate hostility or resistance to the officers." *Id.* at 4. The training

instructed these officers that they should try to put a person seizing in the recovery position, "let them ride out the seizure," and ensure that the person seizing did not injure themselves while experiencing involuntary spasms. Defs.' Exs. at 184:13–185:10; Le Dep. at 15:22–18:18. There is no evidence that the Deputies were advised to forcibly hold them in the recovery position; rather, their training materials clearly state that they must *not* restrain the individual while seizing. Seizure Training at 4.

The Deputies were also taught when use of the WRAP device is appropriate. Defs.' Exs. at 179:24–181:21, 282:12–283:1. The Deputies' use of force guidelines explain that the WRAP device should only be used on "violent subjects" or subjects that pose an escape risk. Dkt. 99-24 ("Force Guidelines") at 15. This device is required in lieu of leg chains when an individual is "kicking" and thereby, "pos[ing] a threat to themselves, others, or to equipment" or when an individual is trying to escape. *Id.* Deputy Bohan testified that different standards apply when only using a WRAP ankle strap, explaining that this is an appropriate tool to use when an inmate is kicking or trying to stand up. Defs.' Exs. at 181:13–15.

## H. Procedural Background

Plaintiff filed this action on May 13, 2022, alleging that Deputies Banaga, Bohan, Jacobo, Tapia, and Le used excessive force against him while he was experiencing seizures by (1) restraining him in the holding cell; (2) restraining him in the wheelchair while in the medical examination room; (3) restraining him in the recovery position while he received medical care and was monitored thereafter; and (4) applying the WRAP device. *See* Third Am. Compl. at 10–12. He also claimed that Lieutenant Martinez and Sergeant Garcia violated his constitutional rights by failing to stop the five deputies from using this excessive force even though they were present. *Id.* at 20–21. Accordingly, Plaintiff brings excessive force claims pursuant to 42 U.S.C. § 1983 and a state law claim under the Bane Act, Cal. Civ. Code § 52.1, against the five deputies, as well as supervisory liability claims

/ / /

pursuant to § 1983 against Lieutenant Martinez and Sergeant Garcia.[6]  *See generally* Third Am. Compl.  On August 16, 2024, Defendants brought a motion for summary judgment against Plaintiff on the above claims.  Mot. Summ. J.

The Court held oral argument on Defendants' summary judgment motion on October 31, 2024.  *Id.*; Dkt. 127 ("Summ. J. Tr.").[7]  At the hearing, the Court ruled as follows.  First, the Court found that Deputy Banaga was entitled to qualified immunity and thus granted Defendants' motion to that extent.  Summ. J. Tr. at 10–24.  Second, the Court found that Plaintiff had raised a triable issue as to whether the Deputies' use of force caused his injuries in light of Dr. Kapuria's medical opinion and thus, denied Defendants' motion on this ground.  *Id.* at 4–7.  Lastly, the Court ordered supplemental briefing and took under submission the issues of whether (1) the remaining deputies (Deputies Le, Tapia, Jacobo, and Bohan), Lieutenant Martinez, and Sergeant Garcia were entitled to qualified immunity and (2) Plaintiff's Bane Act claims fail as a matter of law.  *Id.* at 51.  Defendants have since withdrawn their motion for summary judgment on Plaintiff's claims under the Bane Act and conceded that these claims should proceed to trial, eliminating the Court's need to review these state law causes of action.  *See* Dkt. 128 at 11–12.  After reviewing the parties' supplemental briefing, the Court issues the following order superseding its earlier oral ruling to the extent that the orders differ.[8]

---

[6] In addition to these claims, Plaintiff originally pled that individual Defendants violated his Fourteenth Amendment rights pursuant to § 1983 for failure to provide medical care and that individual Defendants and the County committed battery and negligence under state law.  Third Am. Compl. at 13–19.  On August 2, 2024, the parties jointly moved to dismiss these claims, and the Court granted this motion on August 6, 2024.  Dkts. 82, 84.

[7] At oral argument, the Court also addressed the majority of the parties' evidentiary objections.  Summ. J. Tr. at 7–9.  Accordingly, in this order, the Court only addresses objections that have not yet been addressed.

[8] At oral argument, the Court provided a tentative ruling concerning a portion of the qualified immunity analysis, explaining that a reasonable jury could conclude that the Supervisory Officers (1) were present for the incident on March 9, 2021; (2) were aware Plaintiff was having a seizure; and (3) did not

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  Fed. R. Civ. P.  56(a); *Celotex Corp.  v.  Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.* at 248–50.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If the non-moving party bears the burden of proof at trial, the movant can meet its initial burden of production by providing evidence that (1) negates an essential element of the nonmoving party's claims or (2) shows that the nonmoving party does not have sufficient evidence to carry its burden at trial.  *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  Where this initial burden is met, the burden shifts to the non-moving party to set forth, by "*citing to particular parts* of materials in the record," "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(e).  The court determines whether the nonmoving party's "specific facts . . . coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict" for the nonmoving party.  *T.W. Elec. Serv. v. Pac. Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987) (internal citations omitted).  In such

---

stop the use of downward pressure or the WRAP device discussed above. Summ. J. Tr. at 18–21.  In this order, the Court reconsiders whether Plaintiff has raised a triable issue that Supervisory Officers Garcia and Martinez acquiesced in the Deputies' purported use of excessive force and thus, whether they are entitled to qualified immunity.  *See City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (explaining that district courts have the "inherent procedural power to reconsider, rescind, or modify an interlocutory order" (internal quotation marks and citation omitted)).  It also revisits and reexamines its analysis of whether Plaintiff raised a triable issue of whether the Deputies used excessive force in all four of the alleged instances.  *See id.*; Dkt. 127 at 29.

a case, summary judgment is inappropriate. *Anderson*, 477 U.S. at 248. However, where a rational trier of fact could not find for the nonmoving party based on the record as a whole, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986) (internal citation and quotation marks omitted).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Rather, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Id.* "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

Given the evolving nature of the players who interacted with Plaintiff, the circumstances they confronted, and their different levels of knowledge, the Court has organized its analysis of Plaintiff's excessive force claims into four separate phases: (1) when Deputy Le forcibly held Plaintiff in recovery position by restraining his hip and ribs while in the medical holding cell; (2) when Deputies Le and Tapia forcibly restrained Plaintiff in the wheelchair by pushing down on Plaintiff's shoulders and upper back while in the medical examination room; (3) when Deputies Le, Bohan, Jacobo, and Tapia forcibly held Plaintiff in the recovery position while in the medical examination room; and (4) when Deputies Le, Bohan, Jacobo, and Tapia assisted Deputy Banaga in placing the WRAP device on Plaintiff.[9] To determine whether the Deputies involved are entitled to qualified immunity for each of these four phases, the Court will first examine the objective reasonableness of their use of force and, if Plaintiff has raised triable issues in this regard,

---

[9] Deputy Tapia held Plaintiff's legs and the other Deputies held Plaintiff in the recovery position to assist Deputy Banaga in applying the WRAP ankle strap. Banaga Report at 3; Defs.' Exs. at 234:12–235:19, 272:12–19. The Court does not address Deputy Banaga's actions as it already awarded Deputy Banaga qualified immunity in its oral ruling. *See* Dkt. 127 at 16–17, 23–24.

it will then address whether the Deputies violated clearly established law acting as they did.  Second, the Court will evaluate whether Plaintiff has raised triable issues that Lieutenant Martinez and Sergeant Garcia knowingly refused to stop the Deputies from using excessive force against Plaintiff and if so, whether their actions violated Plaintiff's clearly established constitutional rights.

**A. Qualified Immunity in the Context of Excessive Force Claims**

As Defendants assert that they are protected by qualified immunity from Plaintiff's claims that the Deputies subjected him to excessive force, the Court starts by setting forth the law in this area.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citation and quotation marks omitted).  To make this determination, courts ask two questions: "[f]irst, viewing the facts in the light most favorable to [the plaintiffs], did [the defendants] violate a constitutional right?" and "second, if a constitutional right was violated, was it a clearly established right?" *Scott v. Smith*, 109 F.4th 1215, 1223 (9th Cir. 2024).  Because a defendant is entitled to qualified immunity if just one of the above elements is not found, the Court's analysis can begin and end with either element.  *Pearson*, 555 U.S. at 236.

In Fourth Amendment excessive force cases, courts examine whether police officers' actions are "'objectively reasonable' in light of the facts and circumstances confronting them," to determine whether there was a constitutional violation.[10]  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  "In assessing the objective reasonableness of a

---

[10] While pretrial detainees, like Plaintiff, are protected from excessive force that amounts to punishment under the Due Process Clause of the Fourteenth Amendment, courts look to the Fourth Amendment for the "applicable constitutional limitations" regarding the use of force on pretrial detainees. *Lolli v. County of Orange*, 351 F.3d 410, 415 (9th Cir. 2003); *see Graham*, 490 U.S. at 395 n.10.  As such, the Fourth Amendment standard for excessive force claims controls.

particular use of force, we consider: (1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (internal citation and quotation marks omitted). In conducting this objective analysis, a court should not consider an officer's "intent or motivation." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) (quoting *Graham*, 490 U.S. at 397).

In evaluating the quantum of force used, courts must look to the "specific factual circumstances," examining both "[t]he nature and degree of physical contact" and the "risk of harm and the actual harm experienced." *Williamson v. City of National City*, 23 F.4th 1146, 1151–52 (9th Cir. 2022) (internal citations and quotation marks omitted). Given its objective analysis, courts focus on what a reasonable officer on the scene would *expect* the risk of harm to be. *Id.* at 1152; *see Young v. County of Los Angeles*, 655 F.3d 1156, 1161–62 (9th Cir. 2011) (instructing that courts must assess whether a use of force is "capable of inflicting significant pain and causing serious injury"). In making this determination, courts may consider whether the officer was informed or trained to not use the force in question. *See Nelson v. City of Davis*, 685 F.3d 867, 878–79 (9th Cir. 2012). When a use of force is "capable of inflicting significant pain and causing serious injury," it constitutes "intermediate force, that while less severe than deadly force, nonetheless present[s] a significant intrusion upon an individual's liberty interests." *Young*, 655 F.3d at 1161–62 (internal citations and quotations omitted). With respect to the actual injuries, "[t]he presence of non-minor physical injuries . . . is certainly relevant in evaluating the degree of the Fourth Amendment intrusion." *Bryan v. MacPherson*, 630 F.3d 805, 824–25 (9th Cir. 2010). Ultimately, "[t]he greater the risk of harm and the actual harm involved, the greater the governmental interest must be to justify the use of force." *Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 821 (9th Cir. 2023).

Second, courts assess the following non-exhaustive list of factors in evaluating the

government's interest in using such force: (1) whether the suspect posed an immediate threat to anyone; (2) whether the suspect resisted or attempted to evade arrest; and (3) the severity of the crime at issue (the "*Graham* factors"). *Graham*, 490 U.S. at 396. The most important of these factors is whether the suspect posed an immediate threat. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011). Additionally, courts should contemplate whether the amount of force was necessary to prevent or address any medical emergencies involving a "serious . . . life threatening" situation, whether to the plaintiff or others. *See Ames v. King County, Washington*, 846 F.3d 340, 349 (9th Cir. 2017).[11]

Courts make this assessment "from the perspective of a reasonable officer on the scene" and not "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. When "[a]n officer's particular use of force is based on a mistake of fact," courts must evaluate "whether a reasonable officer would have or should have accurately perceived that fact." *Torres*, 648 F.3d at 1124. In determining what an officer "should have known," courts may consider whether the officer was trained on the matter, whether the officer acted in accordance with that training, and whether following the training would have led to a different outcome. *Id.* at 1125 (internal citation omitted).

Even if a court finds a constitutional violation, it must still determine whether the officers violated "clearly established" law. *Vanegas v. City of Pasadena*, 46 F.4th 1159, 1164 (9th Cir. 2022). "An officer cannot be said to have violated a clearly established right

---

[11] The Court is aware that the Sixth Circuit has adopted a specific three-factor test for excessive force claims arising out of officers' uses of force in a "medical-emergency context." *See Estate of Hill by Hill v. Miracle*, 853 F.3d 306, 314 (6th Cir. 2017); *Nowell v. Trimmed Ambulance, LLC*, No. 17-cv-1133RSL, 2019 WL 172631, at *8 (W.D. Wash. Jan. 11, 2019). While the Court does recognize that the *Graham* factors are an imperfect fit for circumstances like those presented here, absent clear direction from the Ninth Circuit, the Court declines to import the Sixth Circuit's test.

unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (internal citation and quotation marks omitted). To make this determination, courts "only look to controlling authority or a robust consensus of cases of persuasive authority to determine settled law." *Vanegas*, 46 F.4th at 1164 (internal citation and quotation marks omitted). However, courts need not identify a "case dealing with the particular facts" of the case at hand for the officers' conduct to violate a clearly established right. *Scott v. County of San Bernardino*, 903 F.3d 943, 951 (9th Cir. 2018) (internal citations and quotation marks omitted). All that is required is that the caselaw be sufficiently analogous such that a reasonable officer in the defendants' position would understand that their conduct is unlawful. *Id.* While plaintiff bears the burden of "showing that the rights allegedly violated were clearly established," defendants carry the ultimate burden of proving that they are entitled to qualified immunity. *See Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017); *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017).

With this precedent in mind, the Court turns to each of the four instances of excessive force alleged by Plaintiff.

**B. Whether the Deputies Are Entitled to Qualified Immunity for Their Interactions with Plaintiff**

### 1. Phase One: Deputy Le Restrained Plaintiff in the Recovery Position in the Medical Holding Cell

*Constitutional Violation*

Defendants argue that Deputy Le reasonably applied downward pressure on Plaintiff to keep him in the recovery position while he was experiencing a medical emergency in the medical holding cell. In evaluating this argument, the Court must ascertain whether Plaintiff has raised triable issues on two key facts: whether Plaintiff was experiencing a seizure at this time and whether a reasonable officer would have recognized this.

After reviewing the record, the Court finds that Plaintiff has raised a triable issue as

to whether he was experiencing a seizure in the medical holding cell when Deputy Le forcibly held him in the recovery position.  First, it is undisputed that Plaintiff is a diagnosed epileptic and that he had notified Deputies Le, Jacobo, and Bohan that he was about to have a seizure.  Pl.'s Exs. 12, 13; SUF ¶ 9.  The record also reflects that at first, Plaintiff was disoriented; then his body became stiff, thrashed from side to side, and mirrored "seizing;" and then he became "unresponsive."  Le Report at 2–3; Bohan Report at 3; Jacobo Report at 2; Defs.' Exs. at 75:19–76:3, 83:12–84:6.  Although Defendants insist that Plaintiff was suffering from alcohol intoxication, these behaviors are also consistent with seizure symptoms of "[l]oss of awareness," "stiffening of muscles," "loss of consciousness," and "rhythmic jerking movements" identified by Dr. Kapuria.  Dr. Kapuria Report at 3.  Accordingly, the Court finds that Plaintiff has raised a triable issue of whether he was having a seizure at this time.

Not only has Plaintiff raised a triable issue as to whether he *in fact* was experiencing a seizure, but he has also created a genuine dispute as to whether a reasonable officer would have recognized it.  First, the parties do not contest that Plaintiff informed Deputies Le, Jacobo, and Bohan that he "was going to have a seizure" and that he had a documented history of epilepsy. Pl.'s Ex. 12; Pl.'s Ex. 13; SUF ¶ 9.  The record also reflects that Deputy Le was trained to identify signs of seizures, such as "jerking uncontrollably," "purposeless sounds and body movements," "partial or complete loss of consciousness," and "lack of response." Seizure Training at 3; Le Dep. at 3:7–18:18.  Deputy Le not only described Plaintiff as exhibiting these same symptoms—unresponsive, stiff, and shaking—but also explicitly noted in his report that Plaintiff was moving "as if he were seizing" at the time.  Le Report at 3; Le Dep. at 50:11–51:11; Defs.' Exs. at 75:19–76:3, 83:12–84:6.  Based on the above, the Court finds that Plaintiff has created a triable issue that a reasonable officer would have been able to recognize that Plaintiff was having a seizure when Deputy Le used force to hold him in recovery position.

Despite arguing that Deputy Le only applied force to help facilitate emergency medical treatment, Defendants have not introduced any evidence establishing that

22-cv-00675-JO-AHG

Plaintiff's health or safety demanded this restraint. Deputy Le testified that he placed Plaintiff in the recovery position because he thought Plaintiff was seizing and wanted to help him. Defs.' Exs. at 82:16–83:11, 127:9–128:4; SUF ¶ 44. While the record reflects that the Deputies were trained that they should place a person seizing in the recovery position, they were also advised to "let [the person] ride out the seizure" and to never apply restraint. Defs.' Exs. at 184:13–185:10; Seizure Training at 3–4. As there is no evidence that Deputy Le was informed by medical staff to restrain Plaintiff or that there was a graver medical emergency requiring such action, Defendants have failed to demonstrate as a matter of undisputed fact that Le's actions were required for medical or life-saving purposes.

Based on these factual disputes, a reasonable jury could find Deputy Le's restraint of Plaintiff objectively unreasonable. First, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that Deputy Le's actions constituted a significant intrusion given the risks associated with restraining Plaintiff while he was seizing and the severity of his actual injuries. *Williamson*, 23 F.4th at 1152. While downward pressure is generally considered minimal force, *see Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994), applying restraint on an individual experiencing a seizure presents inherent risks of injury that would otherwise not be present, *Williamson*, 23 F.4th at 1152; *see also Seidner v. de Vries*, 39 F.4th 591, 597 (9th Cir. 2022) (explaining that courts should not examine use of force in a vacuum, but rather must evaluate the inherent risks in using that force based on the circumstances). Given that Deputy Le was taught how to identify a seizure and instructed to *not* restrain an individual who is having a seizure, a reasonable officer in his position would know that using this prohibited force on Plaintiff would present a higher risk of medical harm. *See Nelson*, 685 F.3d at 879; Seizure Training at 3–4. Further, a reasonable jury could also find Plaintiff's actual injury was significant if it credits Plaintiff's evidence that he suffered long-term weakness and loss of sensation in his legs, impacting his mobility. *See Santos v. Gates*, 287 F.3d 846, 853–54 (9th Cir. 2002) (finding intrusion severe where resultant injury caused him both "pain and immobility");

Dr. Kapuria Report at 3; Frias Dep. at 6:6–10.

Compared to what a reasonable jury could deem substantial force, the governmental interest in using such force is wanting. *See Graham*, 490 U.S. at 396. The triable facts in the light most favorable to Plaintiff show that there was no need for *any* force, let alone force capable of causing serious injury. *See id.* As Plaintiff was suffering a seizure, there was no danger of flight, no threat to the safety of officers, nor any question that Plaintiff was willfully resisting an officer's efforts to restrain him. *See id.* (considering factors such as whether plaintiff posed a threat, resisted arrest, or attempted to evade arrest in assessing the government's need to use force). Nor was there a need to apprehend someone who had committed a serious crime—Plaintiff was already in pre-trial custody when these events arose. *See id.* (examining the severity of the crime as another factor). Even if Deputy Le subjectively believed this force was necessary to protect Plaintiff during his medical episode, there is no evidence in the record that the situation objectively called for such a response. *See* SUF ¶ 44. Le was specifically trained not to restrain individuals during a seizure, Seizure Training at 4, and there were no signs that Plaintiff could not breathe or that he required immediate medical intervention warranting deviation from this training. *See Torres*, 648 F.3d at 1126 (explaining that an officer's prior training on how to respond to an event can create a triable issue of fact of whether he reasonably responded to the event); *cf. Ames*, 846 F.3d at 349 (holding that a medical injury posing a life-threatening situation contributed to the government's interest in using force); Seizure Training at 4.

For the above reasons, the Court concludes that a reasonable jury could find that Deputy Le's actions were objectively unreasonable because there was little to no governmental interest justifying Deputy Le's use of potentially dangerous force. *See Rice*, 989 F.3d at 1121.

### *Clearly Established Law*

Because it finds that Plaintiff has established a triable issue of whether Deputy Le used excessive force against him, the Court proceeds to examine whether clearly established precedent would have placed Deputy Le on notice that his actions were

unlawful.

The Ninth Circuit has long held that officers violate a plaintiff's Fourth Amendment right to be free from excessive force when they use force contrary to their training on a medically vulnerable plaintiff who is not resisting. In *Drummond ex. rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056–62 (9th Cir. 2003), the Ninth Circuit held that the officers used excessive force on a mentally disturbed plaintiff when they forcefully restrained him even though he was not resisting. In *Drummond*, the officers were initially called to "help protect" the plaintiff because he was experiencing a mental breakdown. *Id.* at 1054. Although the officers originally called an ambulance, they later decided to take him into custody for his own safety. *Id.* The officers knocked the plaintiff to the ground and handcuffed him and, even though he was not resisting, the officer proceeded to press their weight on his neck and back, causing him to call out that "he could not breathe and that they were choking him." *Id.* at 1054–55. In light of these facts, the Ninth Circuit found that the officers' use of force was constitutionally excessive on numerous grounds. *Id.* at 1056–60. First, the Ninth Circuit noted that the officers should have recognized that the plaintiff was "emotionally disturbed" and considered using other tools appropriate for the situation, such as counseling. *Id.* at 1057–58. Second, the Court concluded that the officers did not need to put their weight on the plaintiff's neck as he was already restrained in handcuffs, not resisting, and did not present any criminal threats. *Id.* Lastly, the Ninth Circuit determined that the officers should have known the high risks of employing this force given that their own police department issued a "Training Bulletin" that specifically warned that kneeling on a subject's back or neck could cause asphyxia. *Id.* at 1059. In fact, the Ninth Circuit concluded that the officers were precluded from claiming qualified immunity as a reasonable officer in their position would have been on notice that such force was excessive given that the officers "received training from their *own police department*" specifically warning them that these actions were objectively unreasonable. *Id.* at 1061–62 (emphasis in original).

The similarities between *Drummond* and the facts here would have led any

reasonable officer in Deputy Le's position to understand that their conduct was unlawful under the circumstances. *See Kisela*, 584 U.S. at 105. Like the plaintiff in *Drummond* who was having a mental breakdown, Plaintiff was experiencing a medical episode—a seizure—that caused his behavior. *See* 343 F.3d at 1054–55; Le Dep. at 39:14–40:7, 50:11–51:11. Like the officers in *Drummond*, who knew they were dealing with someone having a mental health crisis, Deputy Le also should have known that Plaintiff was having a seizure given (1) his training, (2) Plaintiff's display of seizure symptoms, and (3) the fact that Plaintiff had informed Le that he may have a seizure. *See* 343 F.3d at 1054–55, 1057–58; Seizure Training at 3; Defs.' Exs. at 75:19–76:3, 77:4–24, 83:12–84:6; SUF ¶ 9. Second, both the officers in *Drummond* and Deputy Le subjectively intended to use force to help: the *Drummond* officers purportedly exerted force for the plaintiff's own protection whereas Deputy Le believed he was helping Plaintiff during a seizure when he forcibly restrained Plaintiff's movements to hold him in the recovery position. *See* 343 F.3d at 1054; Defs.' Exs. at 127:9–128:4; Le Report at 3; SUF ¶ 44. Despite their intentions to help, both sets of officers used a level of force that they should have known through training could cause severe harm: in *Drummond*, kneeling on a subject's back which could cause asphyxia and, in this case, restraining limbs during a seizure despite specifically being told *not* to in such circumstances. *See* 343 F.3d at 1059; Seizure Training at 4. Finally, both sets of officers used substantial levels of force in a situation where the plaintiffs were not resisting nor presenting any criminal threats. *See* 343 F.3d at 1057–58; Le Report at 2–3. The Court finds that *Drummond* would have clearly informed a reasonable officer in Deputy Le's position to not use substantial force contrary to the dictates of training on someone who is neither resisting nor presenting a threat but rather acting out of a medical or mental condition. *See* 343 F.3d at 1059–62.

Defendants' argument that *Drummond* is not factually similar to this case because the officers used greater force in that case is unavailing. While applying body weight on a plaintiff's neck and back is more severe in the abstract than using hand pressure to hold down someone's hip and ribs, this is not the relevant inquiry. *See id.* at 1054–55; Le Report

at 3.  Rather, the question is whether the force was "capable of inflicting significant pain and causing serious injury" in light of the "specific factual circumstances" surrounding the event, *not* in isolation.  *Seidner*, 39 F.4th at 597–98 (citing *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc) and *Young*, 655 F.3d at 1161–62).  Here, the force used by Deputy Le, while minimal in and of itself, had the potential to cause serious harm because it was used to restrain a seizing individual.  As *Drummond* makes clear, officers are prohibited from using a force that, from training, they should have known *not to apply*.  *See* 343 F.3d at 1059–62.  The facts in the light most favorable to Plaintiff here indicate that a reasonable officer in Deputy Le's position should have known that restraining Plaintiff *while* he was having a seizure posed a greater risk of injury than it would in other circumstances because he was trained not to do so.  *See* Seizure Training at 3.  Nor is the Court persuaded by Defendants' argument that Plaintiff's need for medical care distinguishes this case as there is no evidence that Deputy Le's intervention was required to prevent immediate harm or even to provide medical treatment to Plaintiff.  *Cf. Ames*, 846 F.3d at 349 (finding force to pin down plaintiff objectively reasonable where necessary to reach plaintiff's son and prevent him from dying of overdose).  Neither was Deputy Le operating under the instructions of medical staff.  *Cf. Perez v. City of Fresno*, 98 F.4th 919, 926 (9th Cir. 2024).  While Deputy Le may have subjectively believed that this force was needed to assist Plaintiff, his subjective intentions are immaterial as the Court only considers the objective reasonableness of his conduct.  *See Torres*, 648 F.3d at 1124.

Based on the Ninth Circuit *Drummond* case, the Court finds that Le had sufficient notice that his conduct was unlawful.  *See* 343 F.3d at 1057–62.  The Court therefore finds that he is not eligible for qualified immunity for these actions at this stage and denies Defendants' motion for summary judgment on this ground.

/ / /

22-cv-00675-JO-AHG

**2. Phase 2: Deputies Le and Tapia Restrained Plaintiff in the Wheelchair in the Medical Examination Room**

*Constitutional Violation*

The Court next examines whether Deputies Le and Tapia acted reasonably in restraining Plaintiff in the wheelchair while he was in the medical examination room.

First, the Court finds that Plaintiff has raised triable issues as to whether he was suffering a seizure during this phase of the interaction and whether a reasonable officer would have recognized this fact. As discussed above, Plaintiff was a known epileptic and had informed Deputies Le, Jacobo, and Bohan that he was going to have a seizure. Pl.'s Ex. 12; Pl.'s Ex. 13; SUF ¶ 9. It is uncontested that once Plaintiff was in the medical examination room, medical staff and Deputies Tapia, Le, and Jacobo observed that Plaintiff "thrash[ed]" around, had "slurred speech," seemed "disoriented," "could not stand on his own," and exhibited "jerking movement[s]." Jacobo Report at 2; Tapia Report at 2; Le Report at 3; Defs.' Exs. at 318; Udan Decl. ¶ 5. In addition, Deputy Le noticed that "Plaintiff's legs became stiff, his torso arched back and forth, and his body lifted out of the chair" whereas Deputies Jacobo, Bohan, and Tapia observed him lifting himself up while thrashing from side to side. Defs.' Exs. at 90:12–18; Le Report at 3; Jacobo Report at 2; Tapia Report at 3; Bohan Report at 3. As discussed earlier, each of these Deputies were trained to recognize the above symptoms as signs of a seizure. Seizure Training at 3. Accordingly, Plaintiff has created a genuine dispute of material fact as to whether he was having a seizure when Deputies Le and Tapia held him in the wheelchair and whether a reasonable officer would have been aware of this.

Whether Deputies Le and Tapia restrained Plaintiff in the wheelchair in response to a medical or lifesaving need also remains a triable issue in this case. Although Defendants argue that Deputies Le's and Tapia's actions were required to prevent Plaintiff from falling out of the wheelchair and to enable medical staff to treat him, there is no evidence that medical staff instructed them to do so. *See* Tapia Report at 2; Le Report at 3; Defs.' Exs. at 130:16–131:7. Nor is there evidence that Plaintiff was suffering from a medical issue

beyond having a seizure at this point.  Although Nurse Irwin later remarked that he needed Plaintiff to "sit down in the wheelchair for safety reasons" and to conduct his medical evaluation, the record shows that Deputies Le and Tapia had already started restraining Plaintiff *before* Nurse Irwin arrived.  Irwin Decl. ¶ 4.  Given that there is no evidence that medical staff requested that Deputies Le and Tapia hold Plaintiff in this position nor evidence that Plaintiff was facing a graver medical emergency than a seizure requiring intervention, Defendants have not shown that the undisputed facts established a medical need for their actions.

In light of these factual disputes, a reasonable jury could find Deputies Le's and Tapia's use of force to restrain Plaintiff in the wheelchair objectively unreasonable.  As discussed above, if Plaintiff was experiencing a seizure, Deputies Le's and Tapia's restraint—downward pressure on Plaintiff's shoulders and upper back—would pose graver risks than in other circumstances.  *See Nelson*, 685 F.3d at 879; Seizure Training at 3–4; Le Report at 3; Tapia Report at 3.  Because Deputies Le and Tapia would have reason to know use of such force carried a high risk of harm, given that their training instructed them *not* to restrain an individual under such conditions, and because Plaintiff was ultimately rendered partially immobile, a reasonable jury could find their use of force substantial.  *See Nelson*, 685 F.3d at 879; Seizure Training at 3; Dr. Kapuria Report at 3; Frias Dep. at 6:6–10.

Because of the factual disputes in the record, a reasonable jury could also find that the government had little to no interest in exercising this force on Plaintiff while he was not posing any threat or resistance, but rather having a seizure.  *See Mattos*, 661 F.3d at 441 (explaining that the most important *Graham* factor is whether the suspect presents an immediate threat).  While Defendants argue that they were meeting a medical need—to permit medical staff to evaluate Plaintiff—they have not introduced any evidence that there was an immediate medical need to conduct that evaluation such that they could not wait for the seizure to subside.  *See* Tapia Report at 2; Le Report at 3.  Defendants also argue that they restrained Plaintiff to keep him from falling out of the wheelchair but this potential

harm did not necessarily justify use of force that could inflict even greater harm. *See Glenn*, 673 F.3d at 873 (explaining that it would be illogical to "permit officers to use force capable of causing serious injury or death in an effort to prevent the possibility that an individual might attempt to harm only himself"); Le Report at 3. As there was no evidence of a medical emergency warranting Deputies Le's and Tapia's use of force, a reasonable jury could conclude that the government had no interest in exercising force to keep Plaintiff in the wheelchair and thus, that there was no objectively reasonable justification for restraining Plaintiff while he was seizing. *Cf. Ames*, 846 F.3d at 349.

Therefore, the Court concludes that Plaintiff has raised a genuine issue of material fact as to whether Deputies Le and Tapia used excessive force by restraining Plaintiff to keep him in the wheelchair. *See Rice*, 989 F.3d at 1121.

### *Clearly Established Law*

Because the Court finds that Plaintiff has established a triable issue of whether Deputies Le and Tapia violated his constitutional rights, the Court must examine whether they should have been aware at the time that it was unlawful to apply restraint to an individual experiencing a seizure in the absence of exigent circumstances.

Similar to the last scenario in which Deputy Le restrained Plaintiff in the recovery position, the Ninth Circuit's holding in *Drummond* would have put Deputies Le and Tapia on notice that their use of potentially dangerous force to restrain a seizing individual in a wheelchair in the absence of a threat, resistance, or immediate medical need was unlawful. *See* 343 F.3d at 1056–62. When Deputies Le and Tapia applied this force, they were again under the impression that they needed to restrain Plaintiff to protect him from falling and to help him receive medical care. Le Report at 3; Tapia Report at 3. However, *Drummond* instructs that the reasonableness of an officer's actions do not turn on whether they subjectively intended to advance a plaintiff's medical needs or to protect them. *See* 343 F.3d at 1054, 1057–58 (finding officers' force still excessive despite the fact they used force for their "own protection"). Despite Deputies Le's and Tapia's good intentions, they used a force—restraining someone's limbs while he was seizing—that they should have

known *not* to apply.  *See id.* at 1059–62; Seizure Training at 3.  Further, in the absence of any emergency medical need, Deputies Le and Tapia used force even though they should have recognized that Plaintiff was not resisting or posing a threat given his seizure.  *See id.* at 1056–59.

Nor does the Ninth Circuit's decision in either *Ames* or *Perez* counsel otherwise.  In *Ames*, the plaintiff prolonged a medical emergency and endangered her son's health by obstructing medical personnel from treating her son.  846 F.3d at 349.  Here, there is no record evidence of an urgent medical crisis to justify the use of potentially harmful force.  Rather, as the record stands, Plaintiff's only medical issue at the time may have been his own seizures.  Defs.' Exs. at 100:16–23.  *Perez* is likewise inapplicable.  *See* 98 F.4th at 926.  The officers there used force at the *behest* of medical personnel whereas here there is no evidence that medical staff instructed Deputies Le and Tapia to restrain Plaintiff in the wheelchair.  *Id.*  Although Nurse Irwin attested after the fact that he needed Plaintiff to "sit down in the wheelchair for safety reasons" and for medical evaluation, there is no evidence that this was communicated to the Deputies in real time.  Irwin Dec. ¶ 4.  In fact, Nurse Irwin testified that Deputies Le and Tapia had made this decision and began restraining Plaintiff *before* he had arrived.  *Id.*

In light of the Ninth Circuit's decision in *Drummond*, the Court finds that Deputies Le and Tapia had sufficient notice that their conduct was unlawful.  *See* 343 F.3d at 1059–62.  The Court therefore finds that Deputies Le and Tapia are not eligible for qualified immunity for their actions during this phase of their interactions with Plaintiff and denies Defendants' motion for summary judgment on this ground.

### 3. Phase 3: Deputies Le, Tapia, Bohan, and Jacobo Restrained Plaintiff to Keep Him in the Recovery Position for Medical Treatment and Monitoring

*Constitutional Violation*

The Court next examines whether Deputies Le, Tapia, Bohan, and Jacobo acted reasonably when they used force to hold Plaintiff in the recovery position while in the medical examination room.

Unlike in the previous two phases of the Deputies' interactions with Plaintiff, Defendants have established that there was an urgent situation endangering Plaintiff's life when the Deputies held him in recovery position on his side. The record reflects that when Plaintiff suddenly slumped over and became unresponsive while in the medical examination room, medical staff requested that the Deputies place him in the recovery position to both help his breathing and enable them to access his airways. SUF ¶ 18. It is uncontested that once Plaintiff was on the ground, he began to thrash about, kick his legs, and constantly move, preventing him from remaining in the recovery position, requiring Deputies Le, Jacobo, and Tapia to use force to keep Plaintiff still.[12]  Magno Decl. ¶ 4; Bohan Report at 3; Le Report at 3; Jacobo Report at 2; Tapia Report at 3. Further, the evidence shows that once Plaintiff was secured in the recovery position, medical personnel immediately began treatment by using instruments to resuscitate him and clear his airways, successfully leading Plaintiff to vomit and regain consciousness. Udan Decl. ¶¶ 6–7. Nurses Udan, Irwin, and Magno all confirm that they could not have provided this emergency care without Plaintiff being in the recovery position. *Id.* ¶¶ 6, 13; Irwin Decl. ¶¶ 7–8, 11; Magno Decl. ¶ 5. After regaining consciousness, the record reflects that Plaintiff began to move even more, resisting the Deputies' pressure, thrashing back and forth, and kicking. Bohan Report at 3; Le Report at 3; Defs.' Exs. at 107:6–108:5, 112:21–113:2, 222:5–15. As medical personnel needed Plaintiff to remain in the recovery position

---

[12] Contrary to Plaintiff's contentions, there is no evidence in the record that creates a genuine dispute of material fact concerning the amount and type of force Defendants applied. Plaintiff asserts that the record shows that the Deputies Le, Bohan, Tapia, or Jacobo placed their full bodyweight, rather than merely downward pressure, on Plaintiff. Dkt. 99 at 24. However, the only evidence in the record supporting this inference is (1) the County's use of force policy which contains information on the "Swarm Technique," in which a group of officers use their combined bodyweight to gain control of a resisting subject and (2) Deputy Banaga's testimony that he previously reported that he applied his body weight to Plaintiff's calves. Force Guidelines at 12; Banaga Dep. at 13:13–14:2. This evidence alone does not create a genuine dispute of as to whether Deputies Le, Bohan, Tapia, or Jacobo—not Banaga (who arrived later anyhow)—used their body weight. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250 (explaining that a "mere existence of a scintilla of evidence" that supports the Plaintiff's position is not sufficient to defeat summary judgment).

22-cv-00675-JO-AHG

in order to continue monitoring his airways and vital signs, the undisputed facts show that the Deputies Le, Tapia, Jacobo, and Bohan only applied force as necessary to keep Plaintiff in this critical position.  Udan Decl. ¶ 9; Irwin Decl. ¶¶ 10, 13; Defs.' Exs. at 168:13–22, 230:6–12, 263:10–13; Le Report at 3.  Thus, irrespective of whether Plaintiff was experiencing a seizure at the time, the undisputed facts demonstrate that Plaintiff was facing an urgent medical issue that demanded he be in the recovery position to receive immediate medical care.

Given these undisputed facts, the Court finds that even when looking at the evidence in the light most favorable to Plaintiff, a reasonable jury could not find that the Deputies employed excessive force.  First, when viewing the facts in the light most favorable to Plaintiff, the Court recognizes that a reasonable jury could find the Deputies' use of force substantial given that four officers applied downward pressure to restrain Plaintiff while he was having a seizure.  *See Nelson*, 685 F.3d at 879; Seizure Training at 3; SUF ¶¶ 18, 20, 22.  However, the Court finds that this significant use of force was justified because it was necessary to restore Plaintiff's breathing.  *See Graham*, 490 U.S. at 396; Udan Decl. ¶¶ 6, 13; Irwin Decl. ¶¶ 7–8, 11; Magno Decl. ¶ 5.  Although Plaintiff did not pose a threat or resistance and was experiencing a seizure, Plaintiff's medical emergency that could have resulted in him losing his life—his breathing had slowed to the point where it was barely perceptible.  *See Ames*, 846 F.3d at 349 (finding that government had an interest in preventing the prolongation of an individual's medical emergency); Udan Decl. ¶¶ 5–6.  As Plaintiff's conduct—thrashing, kicking, and constantly moving—was interfering with medical personnel's ability to resuscitate him and later monitor his airways, their use of force was reasonably necessary to ensure that he could get immediate life-saving medical care.  *See Ames*, 846 F.3d at 349 (finding force reasonable given that the officers "continued to be highly concerned for [individual's] immediate survival" because he "appeared completely unconscious" and "needed immediate help"); Bohan Report at 3; Le Report at 3; *Id.* ¶¶ 6, 9, 13; Irwin Decl. ¶¶ 7–8, 10, 11; Magno Decl. ¶ 5.  Further, the record reflects that the Deputies used this force under orders from medical staff.  *See Perez*, 98 F.4th at

22-cv-00675-JO-AHG

926; SUF ¶ 18.  Ultimately, on balance, the Court concludes that the governmental interest outweighs any intrusion on Plaintiff's Fourth Amendment rights during this phase of his interactions with law enforcement.  *See Rice*, 989 F.3d at 1121.  As the Deputies were responding to an urgent situation, following the instructions of medical staff, and using force to help protect Plaintiff's life, the Court finds that their actions were objectively reasonable as a matter of law.  *See Ames*, 846 F.3d at 349.

Because the Court has determined that Deputies Jacobo, Tapia, Le, and Bohan were objectively reasonable in restraining Plaintiff in the recovery position to receive medical treatment and be monitored, the Court finds that the Deputies did not violate Plaintiff's constitutional rights and thus, that they are entitled to qualified immunity.  *See Pearson*, 555 U.S. at 236.  As such, the Court grants Defendants' motion for summary judgment with respect to this phase of the interaction without reaching whether clearly established law prohibited this conduct.

### 4. Phase 4: Deputies Le, Tapia, Bohan, and Jacobo Further Restrained Plaintiff in Applying the WRAP Device's Ankle Strap

*Constitutional Violation*

The Court next considers whether Deputies Le, Tapia, Bohan, and Jacobo acted objectively reasonably in helping place the WRAP ankle strap on Plaintiff while they were waiting for the paramedics to arrive.[13]

In weighing the objective reasonableness of the Deputies' actions, the Court first considers whether Plaintiff has raised triable issues as to whether he was suffering a seizure when the Deputies applied the ankle WRAP strap and whether a reasonable officer would have recognized it as such.  As discussed above, Plaintiff was a known epileptic and had

---

[13] The Court does not reach whether there is an existing dispute of fact as to whether the entire WRAP device or the ankle strap was applied because even when operating under the presumption that only the ankle strap was applied, the Court still finds that Plaintiff has raised a triable issue of whether the Deputies violated his right to be free from excessive force.

notified Deputies Le, Jacobo, and Bohan earlier that day that he was going to have a seizure.  Pl.'s Ex. 12; Pl.'s Ex. 13; SUF ¶ 9.  By this point, Plaintiff had exhibited seizure-like behavior multiple times—both in the medical holding room and medical examination room.  Le Dep. at 39:14–40:7, 50:11–51:11; Defs.' Exs. at 100:16–23.  At the time the ankle strap was applied, Deputy Banaga observed that Plaintiff was "rolling from shoulder to shoulder on his back," tensing up his body, and pulling his legs in towards his chest.  Banaga Report at 2.  Further, at some point prior to the Deputies applying the ankle strap, Deputies Bohan and Le saw Plaintiff was swinging his arms around and jerking his torso back and forth.  Defs.' Exs. at 107:6–108:5, 222:5–15.  Although many of the Deputies believed that Plaintiff was resisting their control and attempting to escape by curling his legs, these symptoms are also consistent with what the Deputies learned are signs of a seizure, including "jerking uncontrollably" and "purposeless sounds and body movements."  *See id.*; Banaga Report at 3; Seizure Training at 3.  Moreover, the Deputies were specifically taught to *not* interpret these seizure symptoms as resistance or a threat.  Seizure Training at 3.  Accordingly, Plaintiff has created a genuine dispute of material fact as to whether he was having a seizure when the Deputies applied the ankle strap and whether a reasonable officer would have recognized such.

The Court next determines whether Defendants have established that Plaintiff was experiencing a medical crisis requiring emergency care when the Deputies applied the WRAP ankle strap.  Although the Deputies attested that they applied the ankle strap to facilitate speedier transport to the hospital (i.e., prevent Plaintiff from kicking which would interfere with their ability to quickly transfer him onto the gurney), there is no evidence that Plaintiff's medical condition required urgent transport.  Banaga Report at 3; Defs.' Exs. at 281:8–282:11.  Further, the record reflects that unlike Plaintiff's earlier medical episode, in which he became unconscious and needed to be resuscitated, at this point Plaintiff's vitals were stable, his airways were being monitored, and he was surrounded by medical staff up until the paramedics arrived.  *See* Irwin Decl. ¶¶ 10, 13; Defs.' Exs. at 315–16, 320–21.  Nor is there evidence that medical staff informed the Deputies that

Plaintiff had any immediate medical needs requiring restraint or urgent transfer to the hospital. Accordingly, the Court concludes that a triable issue remains as to whether the Deputies were responding to an emergency medical situation or, instead, acting for the sake of expediency and efficiency when they applied the ankle strap prior to the paramedics' arrival.

Given these disputed facts, that Court finds that a reasonable jury could conclude that the Deputies' use of force in applying the ankle strap was objectively unreasonable. As addressed above, because the facts in the light most favorable to Plaintiff show that he was having a seizure, the Deputies' restraint—locking Plaintiff's feet together—would be more likely to cause physical harm than in other situations. *See Nelson*, 685 F.3d at 879; Seizure Training at 3; Defs.' Exs. at 182:9–13. The government had little to no need to use this force *while* Plaintiff was having a seizure; he was not posing any threat or resistance and his medical crisis had subsided, eliminating any need to urgently intervene. *See Graham*, 490 U.S. at 396; *cf. Ames*, 846 F.3d at 349. By this time, Plaintiff had regained consciousness, and his vitals were stable. *See* Irwin Decl. ¶ 10; Udan Decl. ¶ 7. Moreover, unlike the Deputies' use of downward pressure to keep Plaintiff in the recovery position for monitoring, the ankle strap did not facilitate better treatment for Plaintiff after he was resuscitated. *Cf. Ames*, 846 F.3d at 349. While Defendants contend that Plaintiff's kicking interfered with his ability to receive medical care, there is no evidence from medical staff that this prevented them from monitoring him after he had been stabilized and was already being held in the recovery position. *See* Irwin Decl. ¶ 10, 13; Defs.' Exs. at 282:4–11. Further, no record evidence indicates that there was an immediate medical crisis necessitating this restraint at the cost of properly caring for his seizure. *Cf. Ames*, 846 F.3d at 349. Because there was no urgent need to restrain Plaintiff's legs while he was seizing, either to immediately transport Plaintiff to the ambulance or otherwise, a reasonable jury could conclude that the government had little interest in further restraining Plaintiff by applying the ankle strap. *See Graham*, 490 U.S. at 396.

For the above reasons, because the Court concludes that a reasonable jury could find

22-cv-00675-JO-AHG

that the Deputies used substantial force given the risk of harm with minimal governmental interest, Plaintiff has raised a triable issue of whether the Deputies' use of the ankle strap on Plaintiff was objectively unreasonable.  *See Rice*, 989 F.3d at 1121.

### Clearly Established Law

Because the Court has found that Plaintiff has established a triable issue of whether Deputies Le, Tapia, Bohan, and Jacobo violated his constitutional rights by applying the ankle strap, the Court will proceed to evaluate whether clearly established law would have notified these officers that their actions were unlawful.

As with the first two uses of force, the facts and holding of *Drummond* would have alerted the Deputies that restraining a medically vulnerable individual contrary to their training in the absence of a threat, resistance, or immediate medical need was unconstitutional.  *See* 343 F.3d at 1057–62.  Because they were trained to not restrain an individual that is seizing, they were on notice that placing an ankle strap—a device that locks an individual's feet together—on Plaintiff could be medically harmful.  *See id.* at 1059–62; Seizure Training at 3; Defs.' Exs. at 182:9–13.  Despite this understanding, the Deputies still applied the ankle strap to restrain Plaintiff's leg movements even though he was seizing, *not* resisting or posing a threat.  Banaga Report at 3; Seizure Training at 3. Thus, as in *Drummond*, the officers here applied more force than necessary to quell resistance or threats to safety.  *See id.* at 1057–58 (finding force excessive where officers applied violent force even though the plaintiff was already subdued).  Likewise, in applying the ankle strap, the Deputies exceeded what was necessary to meet Plaintiff's safety and medical needs.  *See* Irwin Decl. ¶¶ 10, 13; *cf. Ames*, 846 F.3d at 349 (finding force reasonable because medically necessary).  While restraining Plaintiff earlier for purposes of addressing an immediate and significant medical need was objectively reasonable, there was no need to impose an ongoing leg restraint on a seizing individual in a moment when he was medically stable and there was no need for emergency intervention.  *Cf. Ames*, 846 F.3d at 349.  Although the Deputies claim that they intended to protect Plaintiff from falling and help safely transport him to the ambulance, *Drummond* clearly establishes that an

officer's subjective goodwill is not determinative of whether his actions were reasonable. *See Drummond*, 343 F.3d at 1057 (finding that officers used excessive force even though they acted with the intent of protecting mentally unsound plaintiff); Defs.' Exs. at 282:11. Thus, the Court concludes that a reasonable officer in the Deputies' position would have realized that locking Plaintiff's legs together by using the ankle strap while he was seizing—thereby, restraining Plaintiff beyond what was necessary for his and others' safety—violates the clear prohibition established in *Drummond*. *See* 343 F.3d at 1057–62; *see also Slater v. Deasey*, 789 Fed. Appx. 17, 21–22 (9th Cir. 2019) (finding that additional pressure after the plaintiff was already restrained and not resisting was unconstitutional pursuant to *Drummond*).

The Court therefore finds that the Deputies are not eligible for qualified immunity and denies Defendants' motion for summary judgment on this phase of the interaction.

## C. Whether Sergeant Garcia and Lieutenant Martinez Are Subject to Supervisory Liability for their Deputies Actions

Next, the Court addresses Defendants' arguments that Sergeant Garcia and Lieutenant Martinez are entitled to qualified immunity because they neither knew about nor allowed the Deputies' purported constitutional violations.

"A supervisory official is liable under Section 1983 so long as there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Rodriguez v. County of Los Angeles*, 891 F. 3d 776, 798 (9th Cir. 2018). The required causal connection exists where the supervisor refuses to terminate the actions of their subordinates when they knew, or reasonably should have known, that those actions would cause others to suffer a constitutional violation. *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011); *Maxwell v. County of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2023).

### 1. Sergeant Garcia's Knowledge of the Events

*Constitutional Violation*

There is no record evidence indicating that Sergeant Garcia knew Plaintiff was

having a seizure or how the Deputies acted in response.  The only evidence in the record about Sergeant Garcia's involvement in these events indicates that he was in the hallway between the medical holding cell and medical examination room for some portion of the events and that he spoke to Lieutenant Martinez at some time.[14]  SUF ¶ 94; Defs.' Exs. at 413:19–414:4.  Although Sergeant Garcia attested that he was there to provide support, there is no evidence in the record that he saw Plaintiff's behaviors or the Deputies' responses, or that he was provided this information in any other way.  Defs.' Exs. at 436:15–437:9.  As "mere presence" at the scene does not create a triable issue regarding a supervisor's knowledge, the Court finds that a reasonable jury could not find that Sergeant Garcia was aware of Plaintiff's situation or the Deputies' responsive actions.  *See Jones v. Williams*, 297 F.3d 930, 939 (9th Cir. 2002).  Because Plaintiff has failed to establish a triable issue of whether Sergeant Garcia was aware that the Deputies restrained Plaintiff while he had a seizure, the Court finds that Defendants have proven as a matter of law that Sergeant Garcia did not "knowingly" refuse to terminate the Deputies' alleged constitutional violations.  *See Starr*, 652 F.3d at 1207–08.  Accordingly, the Court grants Defendants' motion for summary judgment with respect to Sergeant Garcia and dismisses him from the case.

## 2. Lieutenant Martinez's Knowledge of the Events

### *Constitutional Violation*

However, the Court finds that Plaintiff has raised a factual dispute of whether Lieutenant Martinez knew that Plaintiff was experiencing a seizure and that the Deputies restrained him anyway.  The record reflects that Lieutenant Martinez stationed himself nearby when the Deputies interacted with Plaintiff so that he could help them handle this

---

[14] Even though Deputy Bohan's report reflects that Sergeant Garcia was present during the "events," this vague statement alone does not create a dispute of fact as to whether he observed and witnessed both Plaintiff have a seizure and the Deputies restrain Plaintiff in response in the four instances. Bohan Report at 3; *Anderson*, 477 U.S. at 250 (explaining that a "mere existence of a scintilla of evidence" that supports the Plaintiff's position is not sufficient to defeat summary judgment).

evolving crisis. Martinez Dep. at 5:13–6:14; Defs.' Exs. at 407:22–24. Positioned to observe and supervise, Lieutenant Martinez saw Plaintiff exhibit seizure-like behaviors while in the medical examination room. Martinez Dep. at 6:15–22. Lieutenant Martinez states that he saw Plaintiff trying to stand up in an unbalanced and uncoordinated manner and slurring his speech at this time. *Id.*; Defs.' Exs. at 418:8–419:12. Although Lieutenant Martinez testified that he did not observe Plaintiff arching his back and straightening his legs, Defs.' Exs. at 419:16–420:17, the actions he did see are consistent with seizure symptoms ("slurred speech" and "purposeless sounds and body movements"). Seizure Training at 3. Further, these behaviors also resembled those that the Deputies saw and interpreted as "seizure activity." Le Report at 3 (observing Plaintiff's body lifting out of the chair); Tapia Report at 3 (witnessing Plaintiff thrashing back and forth); Defs.' Exs. at 100:16–23 (Le testifying that he thought Plaintiff's movements were a "possible sign of seizure activity"). When viewed in conjunction and in the light most favorable to Plaintiff, the facts that Lieutenant Martinez both observed Plaintiff's behaviors and received training on seizure symptoms, raise a triable issue of whether he knew that Plaintiff was experiencing seizure symptoms. *See* Seizure Training at 3; Defs.' Resp. to Req. Produc. Docs. at 8; Martinez Dep. at 6:15–22. Despite his awareness of Plaintiff's seizure-like activity and his admitted role of overseeing the Deputies' response to Plaintiff's situation, Lieutenant Martinez not only failed to intervene when the Deputies were restraining Plaintiff in the wheelchair, but also compelled the Deputies to use further restraint by sending them the WRAP device, which was ultimately used to lock Plaintiff's feet together—all of which were contrary to the dictates of their training. *See* Martinez Dep. at 6:15–22; Defs.' Exs. at 407:22–24, 412:22–413:8.

Viewing this evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has raised a triable issue of whether Lieutenant Martinez knew that Plaintiff was having a seizure and still allowed the Deputies to restrain him in response. Accordingly, the Court finds a reasonable jury could find that Lieutenant Martinez acquiesced in the Deputies' excessive force and thus, denies Defendants' motion for

summary judgment on this basis.  *See Starr*, 652 F.3d at 1207–08; *see e.g. Maxwell*, 708 F.3d at 1086 (affirming no summary judgment for supervisory officers where the plaintiff's version of the facts indicated that the officers did not intervene but were present nearby and observed some of their subordinate's use of force).

### *Clearly Established Law*

As the Court has found that Plaintiff has established a triable issue of whether Lieutenant Martinez violated Plaintiff's constitutional rights by acquiescing in the Deputies' actions, the Court must examine whether he should have known at the time that it was unlawful to ignore the Deputies' use of excessive force.

The Ninth Circuit has long held that a supervisory officer is liable for the constitutional violations of his subordinates when he knows of their culpable actions but fails to act.  *See Starr*, 652 F.3d at 1207–08.  In *Maxwell v. County of San Diego*, the Ninth Circuit affirmed that a reasonable jury could find the supervisory officers liable because they were aware of and witnessed their subordinate pepper spray the plaintiff, hit him with a baton, and handcuff him.  708 F.3d at 1086.  At the time of the events, the supervisory officers were at a distance down the driveway and only witnessed portions of the unlawful acts (hearing "stop, stop, stop" before the pepper spray was used and a "commotion"), but still did not interfere with their subordinate "taking control" of the situation.  *Id.*  Even though they did not participate or approve of their subordinate's actions, the Court found that the officers were not "mere observers," but rather that they "tacitly" endorsed their subordinate's conduct by failing to act."  *Id.*

The Court concludes that the similarities between *Maxwell* and the facts at issue here would have advised any reasonable supervisory officer in Lieutenant Martinez's position that his conduct was unlawful under the circumstances.  *See id.*; *Kisela*, 584 U.S. at 105.  Like the supervisory officers in *Maxwell*, Lieutenant Martinez witnessed the events from a distance—outside the medical examination room—and only observed fragments of the purported constitutional violations: Plaintiff exhibiting possible seizure-like activity and the Deputies' responses.  *See* 708 F.3d at 1086; Defs.' Exs. at 405:22–406:1, 418:8–419:12.

Despite only observing fragments and not directly participating in their subordinates' actions, the supervisory officers in *Maxwell* were still found to have tacitly approved of their subordinate's excessive force.  *See* 708 F.3d at 1086.  Accordingly, a reasonable supervisor in Lieutenant Martinez's position would be aware that it was unlawful to allow the Deputies to restrain Plaintiff while he was having a seizure, even if he was at a distance and did not witness the full series of events.  *See id.*  Moreover, in this case, Lieutenant Martinez's actions went beyond the supervisory officers' conduct in *Maxwell* as he sent the WRAP device to the medical examination room, effectively encouraging the Deputies to restrain Plaintiff in this manner.  Defs.' Exs. at 412:22–413:8.  Accordingly, the Court concludes that Lieutenant Martinez had sufficient notice that his conduct was unlawful. *See Kisela*, 584 U.S. at 105.  As this precedent was clearly established at the time the events occurred, the Court finds that Lieutenant Martinez is not eligible for qualified immunity and denies Defendants' motion for summary judgment on this ground.

## IV. CONCLUSION

For the reasons stated on the record during oral argument on October 31, 2024, the Court DENIES Defendants' motion for summary judgment on the grounds that Plaintiff has not established causation.  Summ. J. Tr. at 4–7.  The Court GRANTS summary judgment in favor of Defendants on the grounds that Deputy Banaga is entitled to qualified immunity and dismisses him from the case.  *Id.* at 10–24.

For the reasons stated above in this opinion, the Court rules as follows.  First, the Court GRANTS Defendants' motion with respect to Deputies Tapia's, Jacobo's, Le's, and Bohan's use of downward pressure to keep Plaintiff in the recovery position in the medical examination room.  Mot. Summ. J.  Second, the Court DENIES Defendants' motion as to (1) Deputy Le's use of downward pressure in the holding cell; (2) Deputies Le's and Tapia's use of downward pressure to keep Plaintiff in the wheelchair; and (3) Deputies Tapia's, Jacobo's, Le's, and Bohan's application of the WRAP ankle device on Plaintiff. *Id.*  Third, the Court GRANTS Defendants' summary judgment motion with respect to Sergeant Garcia's supervisory liability and DISMISSES him from the case.  *Id.*  Lastly, it

DENIES Defendants' motion pertaining to Lieutenant Martinez's supervisory liability. *Id.* [Dkt. 92].

    **IT IS SO ORDERED**

Dated:  March 28, 2025

_____

Honorable Jinsook Ohta
United States District Judge